**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ROGER D. SULLIVAN,

        Plaintiff,

vs.                               Case No. 3:05-cv-491-J-32MMH

CONTINENTAL CASUALTY COMPANY,

        Defendant.

_____

**ORDER**[1]

    This case is before the Court on cross motions for summary judgment.  Plaintiff, Roger D. Sullivan, filed a Motion for Summary Judgment (Doc. 14) and an Amended Motion for Summary Judgment (Doc. 15), and defendant, Continental Casualty Company, filed a Motion for Summary Judgment (Doc. 16).  Defendant likewise filed the Administrative Record (Docs. 17 & 18) and a surveillance DVD of plaintiff (Doc. 19).  The parties filed responses in opposition to the cross motions.  (Docs. 21 & 22).  The Court heard oral argument on May 1, 2006.  (Doc. 24).

_____

    [1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

## I.   BACKGROUND

### A.   The Parties

This is an Employee Retirement Income Security Act ("ERISA") long term disability benefits case wherein plaintiff, Roger D. Sullivan ("plaintiff"), has filed suit against Continental Casualty Company ("Continental Casualty") challenging the decision to discontinue his long term disability benefits ("benefits").  According to Continental Casualty, in early 2004, CNA sold its group life and accident, and short-term and long-term disability business (which included Continental Casualty) to The Hartford.  The administrative record contains an undated notice from The Hartford to plaintiff that provides:

> Important News About Your CNA Group Benefits Plan
>
> Early this year, CNA's group life and accident, and short-term and long-term disability business was sold to The Hartford, one of the nation's largest, most-trusted insurance carriers.  The sale included CNA Group Life Assurance Company, your service provider.
>
> As a result, future communications about your group benefits plan - including any claim payments - will now come to you from The Hartford.
>
> We're pleased to welcome you to The Hartford family and look forward to serving your group benefits needs.

(A.R. H417).  The following page in the administrative record is plaintiff's original long term disability claim form, which plaintiff executed on January 18, 2003.  (Id. at H418-19).  At the top of the first page of that form, there is a handwritten note that states: "CNA - original policy holder with Harris at time of accident - sold to Hartford - 2004."

2

(<u>Id.</u>).  Defendant represents that because of the sale at issue, The Hartford acquired Continental Casualty's assets and liabilities, which included the administration and payment of plaintiff's long term disability claim.

### B.    The Plan

Plaintiff was employed with Harris Group (a consulting engineering firm) as a senior design engineer.  Plaintiff's duties included using a computer for drafting and design; using computer programs to prepare drawings; preparing lists, spreadsheets and databases to document information; filing and archiving drawings; selecting and preparing project standards and designs to conform; reviewing vendor drawings and coordinating with them and other customers and contractors; working in the field with customers to examine whether proposed systems and equipment would fit into designated spaces; and determining whether the systems ultimately installed comported with design drawings.  (A.R. H102-07, 163, 165).  Senior designers are required to work in confined areas in chemical plants, pulp and paper mills, power plants and various other industrial plants to determine the proper routing of piping systems.  (<u>Id.</u> at 163-64).

Plaintiff participated in Harris Group's benefit plan, which was funded by a group insurance policy ("policy")  issued by Continental Casualty.  (<u>Id.</u> at H8-H22 - - the policy).  Under the policy, the monthly benefit to a disabled participant is 60% of pre-disability monthly earnings until age sixty-five.  (<u>Id.</u> at H10, H15).  The policy gives

Continental Casualty the "discretionary authority to determine [a participant's] eligibility for benefits and to interpret the terms and provisions of the policy." (Id. at H8).  The policy provides coverage to participants for a disability, which, during the continuous twenty-four month period following the date of disability (the Elimination Period), is defined as "[an] injury or sickness [that] causes physical or mental impairment to such a degree of severity that you [the participant] are: (1) continuously unable to perform the Material and Substantial Duties of [the participant's] Regular Occupation; and (2) not working for wages in any occupation for which [the participant is or becomes] qualified by education, training or experience." (Id. at H12, H14).  The decision on plaintiff's continued entitlement to benefits in this case fell within the twenty-four month time frame following the elimination period; thus, plaintiff was within the "regular occupation" (or "own occupation") period for purposes of deciding benefit entitlement. (Id. at H104).  The policy defines "regular occupation" as "the occupation [the participant is] performing for income or wages on [the participant's] date of disability.  It is not limited to the specific position [the participant] held with [his or her] employer." (Id. at H22).

Under the plan, the participant is required to provide "proof of disability," which the plan describes as:

> The following items, supplied at Your [the participant's] expense, must be a part of Your proof of loss.  Failure to do so may delay, suspend or terminate Your benefits:

4

1.    The date Your Disability began;

2.    The cause of Your Disability;

3.    The prognosis of Your Disability;

4.    Proof that You are receiving Appropriate and Regular Care for Your condition from a Doctor, who is someone other than You or a member of Your immediate family, whose specialty or expertise is the most appropriate for Your disabling condition(s) according to Generally Accepted Medical Practice;

5.    Objective medical findings which support Your Disability. Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for Your disabling condition(s);

6.    The extent of Your Disability, including restrictions and limitations which are preventing You from performing Your Regular Occupation;

7.    Appropriate documentation of Your Monthly Earnings.   If applicable, appropriate, regular monthly documentation of Your Disability Earnings;

8.    If You were contributing to the premium cost, Your employer must supply proof of Your appropriate payroll deductions;

9.    The name and address of any Hospital or Health Care Facility where You have been treated for Your Disability; [and]

10.    If applicable, proof of incurred costs covered under other benefits included in the policy.

(Id. at H18).

**C.     Background Facts**

Continental Casualty originally provided benefits to plaintiff after a December 5, 2002 motor vehicle accident wherein plaintiff suffered a closed head injury.  Plaintiff ceased working immediately after the accident.  On January 15, 2003, neurosurgeon Javier Garcia-Bengochea, M.D., evaluated plaintiff and diagnosed him with a "closed head injury of moderate concussion and multiple cranial nerve palsies."  (Id. at H385-86).  In addition to his physician notes, Dr. Garcia-Bengochea prepared a physician statement to defendant recapitulating his findings and further noted that: (1) an MRI of plaintiff's brain showed no abnormalities, (2) no further neurosurgical treatment was recommended, (3) plaintiff would follow up with ophthalmologist Walter Smithwick, M.D., (4) plaintiff would undergo a neuro-psychological evaluation by a neurologist, (5) he deferred to Dr. Smithwick concerning plaintiff's ability to return to work and (6) the double vision and balance disorder made "all activities difficult."  (Id. at H332-33).

On January 15, 2003, Dr. Smithwick prepared a physician statement stating plaintiff suffered multiple facial fractures, nerve palsies of the fourth and sixth nerves and diplopia (double vision).  (Id. at H632-33).  Dr. Smithwick established a treatment plan of observation for the following six months and surgery if the symptoms did not resolve.  (Id. at H632).  Finally, Dr. Smithwick noted that "[d]ue to double vision, [the patient] is unable to perform any activities due to risk of fall and further injury to himself or others," and that "[the] injury may resolve but can be permanent even with

surgery." (Id. at H633).

Shortly thereafter, on January 30, 2003, a claims administrator interviewed plaintiff, during which plaintiff stated his "biggest problem[s]" were dizziness and double vision. (Id. at H577). On March 12, 2003, a claims administrator again interviewed plaintiff; plaintiff explained that he still had double vision and that when he looked at distant objects, his vision became wavy and blurred; plaintiff also stated that his vision impairments caused dizziness. (Id. at H348).

On March 24, 2003, Dr. Smithwick prepared a report at the request of defendant, and opined that plaintiff was not capable of returning to the position of lead design engineer[2] because of his double vision, which caused eye strain and loss of depth perception. (Id. at H572). In June 2003, Dr. Smithwick referred plaintiff to neuro-ophthalmologist Paul Brazis, M.D., at Mayo Clinic in Jacksonville, Florida for further diagnosis and a determination of further treatment. (Id. at H384).

On July 30, 2003, Dr. Brazis examined plaintiff and concluded that plaintiff suffered severe double vision and blurred vision as a result of the severe double vision. (Id. at H274). Dr. Brazis noted his concern that it had been seven months

---

[2]    The "Functional Assessment Tool" that Dr. Smithwick prepared for defendant described the position of lead design engineer as requiring "coordination of drafting and design activity on projects; preparing drawings using CAD, preparing lists, spreadsheets and databases to support design drawings; filing and archiving drawings; reviewing vendor drawings and coordinating design with them; coordinating with other disciplines, project areas, customers, vendors and contractors." (Id. at H572).

after the accident and plaintiff's symptoms still had not resolved.  (Id. at H273).  Dr. Brazis recommended that plaintiff consult a strabismus specialist at Mayo Clinic to assess surgical repair options but recommended that no surgery occur until after a year post accident to provide the left eye additional time for gradual improvement.  (Id. at H273-74).

On September 5, 2003, Mayo Clinic Ophthalmologist Robert Hered, M.D., evaluated plaintiff to assess the viability of a strabismus surgery on the left eye.  (Id. at H270-71).  Dr. Hered decided to follow plaintiff for a few additional months, then to surgically correct the double vision if it did not resolve on its own.  (Id.).

Meanwhile, plaintiff was referred to Brooks Rehabilitation Center for a neuropsychological evaluation by Dr. Russell Addeo, a licensed psychologist and a Diplomate in Clinical Neuropsychology.  (Id. at H342-47).  On September 17, 2003, Dr. Addeo performed a neuropsychological evaluation of plaintiff, during which he interviewed plaintiff and performed a battery of tests.[3]  (Id.).  Dr. Addeo's findings were as follows:

Overall, Mr. Sullivan had relatively intact cognitive functions, except for

---

[3]      During the evaluation, Dr. Addeo performed the following tests and procedures: Animal Naming, Beck Depression Inventory-II (BDI-II), Benton Test of Facial Recognition, Boston Naming Test, California Verbal Learning Test-II, Finger Tapping, Grip Strength, Luria Complex Motor Tasks, Minnesota Multiphasic Personality Inventory-II, Multilingual Aphasia Examination -III; Reitan-Klove Sensory Perceptual Examination, Rey-Osterrieth Complex Test, Stroop Test, Test of Memory and Malingering; Validity Indicator Profile, Trail Making Test, Wechsler Abbreviated Scale of Intelligence, and Wechsler Memory Scale-III.  (Id. at H343).

the area of memory, in which he showed mild to moderate impairments. However, he was not providing adequate effort particularly for tests that appeared to be assessing memory.  This suggests that the memory results are not likely properly interpretable.  It is likely that he has come to believe that he has memory impairments, which results in a kind of self-fulfilling prophecy.  Emotionally, he is guarded and prone to repression, but worried about his health and perhaps mildly distressed.

The severity of Mr. Sullivan's head injury is hard to determine....

The positive results of this evaluation are that most of his cognitive skills are intact.  Unfortunately, we cannot determine whether or not he has memory impairments.  The effort tests and clinical judgement would suggest that he has come to believe that he has memory problems, which negatively affects his performance in this area, independently of whether or not he has memory impairments.  This conclusion is also bolstered by his personality profile, which is prone to repression and somatization.  This would suggest that he can likely function at work, from a cognitive and emotional perspective.

(Id. at H345).

On November 12, 2003, clinical psychologist George N. Maida, Ph.D., evaluated plaintiff.[4]  (Id. at H362).  Dr. Maida administered a "mental evaluation with brief neuropsychological assessment," and concluded that:

It appears very clear that Mr. Sullivan cannot safely return to his former career.  Because of cognitive loss his ability to learn new skills is in doubt.  Currently he appears incapable of substantial, consistent employment.  Despite the claimant's view that the primary work impairment is the safety issue, in this examiner's impression there are other more pressing difficulties.  I do not think him capable of the combination of abstract thinking and detailed technical thinking his former occupation demanded, so returning to that work is improbable.

_____

[4]   This evaluation occurred in connection with plaintiff's then pending Social Security Disability claim.  (Doc. 14).  In December 2003, plaintiff qualified for Social Security Disability benefits.  (A.R. H544).

9

> He has difficulty remembering even routine repetitive instructions. This, plus his drowsiness would make him unlikely to succeed now even at a less complex job....

(Id. at H362, H364).

On February 27, 2004, Dr. Hered (neuro-ophthalmologist) performed surgery to fix plaintiff's double vision in his left eye. (Id. at H242-44). Prior to the surgery, Dr. Smithwick wrote a letter to the Office of Attorney General - Bureau of Victim Compensation stating that plaintiff had scheduled surgery with Dr. Hered, and that he "[deferred] any further assessment of his ability to work to Dr. Hered." (Id. at H495). On April 30, 2004, plaintiff made a post-operative visit to Dr. Hered, during which Dr. Hered noted that plaintiff had "excellent postoperative alignment," and that his eyesight was normal in the primary position (orthophoria). (Id. at H247). Plaintiff informed Dr. Hered that he had single binocular vision in the primary position, double vision in his left gaze and up gaze, occasional double vision when looking in an extreme down gaze, "feels safe with driving," is able to read and that the glasses prescribed during a prior visit had improved his blurred vision. (Id.).

On August 8 and 9, 2004, Dempsey Investigations, Inc., whom defendant hired, surveilled plaintiff. The surveillance video shows plaintiff walking and driving to various locations, entering and exiting his pick-up truck and placing an item in the cab of his truck. (Doc. 19).[5]

---

[5]   The surveillance video of plaintiff is not particularly illuminating of whether the extent of plaintiff's injuries preclude him from coverage under the long term disability

10

On August 23, 2004, Dr. Maida (clinical psychologist) prepared an Attending Physician's Supplementary Statement for Disability Benefits and noted that, based on his October 2003 evaluation, plaintiff is "totally disabled," and "[plaintiff's] brain injury impairs his functioning to such a degree he cannot return to his former work or is impaired in learning new [skills]." (A.R. H735). The form shows that Dr. Maida had not evaluated plaintiff since October 2003. (Id. at H734).

On October 25, 2004, The Hartford sent an investigator to plaintiff's home to interview plaintiff concerning his long term disability claim. (Id. at H215-17). During the interview, plaintiff stated that his most significant difficulties were his double vision, dizziness and cognitive abilities. (Id. at 216). Plaintiff also stated, *inter alia*, that: (1) he got easily side tracked while performing his daily activities; (2) his memory was "very bad;" (3) his wife had to leave him a "to do" list so that he remembered to complete his daily chores; (4) he had no difficulty with his long term memory; (5) while he is able to look straight ahead and see with glasses "pretty well," he has double vision when he looks up, down, left and right; (6) he gets extremely dizzy when he looks up and down; (7) he suffers from inability to keep his balance, especially when he looks up or down; (8) he is unable to concentrate because he has a lot of trouble keeping his thoughts "separated" and (9) he can drive, but only short distances, because he is concerned about forgetting where he is or where he is going if he

_____

policy.

11

travels any further than a mile from his home. (Id. at H215-28).

On November 30, 2004, The Hartford wrote to Dr. Hered seeking his opinion on whether plaintiff could return to work and function full-time in his occupation with Harris Group as lead design engineer. (Id. at H229-30). The letter described the lead design engineer as "essentially seated in nature and requir[ing] drafting and design and using computer drafting programs such as CAD, spreadsheets, databases, filing/archiving drawings, reviewing vendor drawings, and coordinating design with other disciplines, projects, customers, vendors, and contractors." (Id.). At the conclusion of the letter, The Hartford asked Dr. Hered whether he recommended any restrictions or limitations to The Hartford's assessment that plaintiff was capable of performing the listed functions of a lead design engineer. (Id.). Dr. Hered responded to the letter on December 8, 2004, and checked "No" in response to that inquiry. (Id.).[6]

On December 20, 2004, The Hartford issued a letter to plaintiff informing him that he was "no longer eligible for benefits under the [long term disability] policy." (Id. at H105). The Hartford based its decision to discontinue benefits, which had been provided since February 2003, on, *inter alia*, interviews with plaintiff throughout the period he received disability (including the October 25, 2004 interview), disability claim forms completed by Dr. Smithwick (ophthalmologist), Dr. Addeo's

---

[6]   The description of lead design engineer sent to Dr. Hered did not include the portions of plaintiff's position that required him to work in the field.

neuropsychological evaluation performed on September 17, 2003, video surveillance taken on August 8 and 9, 2004, the job description provided by Harris Group on January 17, 2002[7] and the communication with Dr. Hered (ophthalmologist) on December 8, 2004.  (Id. at H105-06).

The December 20, 2004 letter informed plaintiff that he had the right to appeal the decision to discontinue benefits and directed him to submit additional medical information not already considered within 180 days of the letter.  (Id. at H107). Plaintiff exercised his right and appealed The Hartford's decision to discontinue his benefits.

To facilitate the appeal, plaintiff sent a letter dated February 8, 2005 to The Hartford stating that: (1) the job description contained in the Hartford's December 20, 2004 letter was not entirely accurate; (2) Dr. Maida's letter dated November 11, 2003 illustrated the true extent of his condition; (3) he would be a liability to his employer (Harris Group) because of his memory loss (i.e., that his memory loss would likely cause him to prepare drawings and sketches that lacked the required complexity and

---

[7]    The job description provided that the "[m]aterial and [s]ubstantial duties of [plaintiff's] [r]egular [o]ccupation include, "the use of a computer for drafting and design; using computer programs such as CAD to prepare drawings; preparing lists, spreadsheets, and databases to document information; filing and archiving drawings; selecting/preparing project standards and design to conform; reviewing vendor drawings and coordinating with them and other customers and contractors."  (Id. at H107).  This description omitted any reference to light duty field work that plaintiff performed.  Later, during the appeal process, Harris Group provided supplemental information discussing the scope of plaintiff's required light duty field work.  (Id. at H163-64).

detail) and (4) his balance problems would make it impossible for him to "walk through buildings and stand for the long periods to sketch the detailed information." (Id. at H357-58).  To support his position that the job description cited in The Hartford's December 20, 2004 letter discontinuing benefits was not entirely accurate, plaintiff included with his appeal a copy of a letter dated January 31, 2005 that his employer (Harris Group) sent to The Hartford further detailing the responsibilities of a senior designer or DSIII (the position that plaintiff performed at Harris).

The January 31, 2005 letter articulates plaintiff's "in office" responsibilities as follows:

> Senior Designers produce engineering design drawings and plans, and also oversee the design activities of Junior Designers and Drafters within their department, and interface regularly with the other departments to insure a well-coordinated design effort.  Memory retention is necessary for Senior Designers since they are required to work with information and data that are complex, and they must be able to process information and data to make decisions that affect the outcome of projects.

(Id. at H360).  The letter further describes the nature of the "out of office" or "field activities" that senior designers are required to perform:

> 1. Gather relevant information about the plant.  Collect drawings, specifications, and data on existing equipment;
>
> 2. Participate in customer's safety training programs, be able to understand, remember, and put into practice the instructions provided by the customer's safety department;
>
> 3. Take field measurements to ensure that the proposed equipment and systems will fit within the designated space;

4.      Take photographs of existing equipment and systems to aid in the design process.  This is a visualization technique used to confirm whether any interferences exist that may require relocation of existing equipment to make room for the new; and

5.      Perform field routing of process piping systems.  The field routing aspect of the job often requires designers to work in confined areas of existing operating power plants, pulp and paper mills, chemical plants and a variety of other industrial plants.  Process piping typically extends not only along the ground floor of the facilities, but vertically to the highest floors of the plant in order to reach equipment located on the elevated floors.  Designers ... often must use safety harnesses when walking onto elevated platforms or structures that do not have handrails.

(Id. at H360-61).

On February 28, 2005, The Hartford wrote to Harris Group and requested a summary of plaintiff's out of office travel from December 2001 through December 2002, including dates and location, as well as other documentation concerning plaintiff's field work during that time.  (Id. at H133).  On March 14, 2005, Harris Group responded via letter and enclosed a spreadsheet itemizing plaintiff's business trips and field work.  (Id. at H131-32).  The spreadsheet showed that from December 2001 through June 2002 plaintiff performed "[d]esign work, in office" at Harris Group's offices in Jacksonville, Florida and Denver, Colorado.  (Id. at H132).  From June 2002 through December 2002, plaintiff performed "[d]esign work, in office" and a "[f]ield assignment in [a] Palatka [Florida] Power Plant."  (Id.).  Harris further explained that the work in the Palatka, Florida plant required plaintiff and another designer to "walk through the power plant, examin[e] the piping systems and compar[e] them against

15

the plant's design drawings.  This [required them] to walk in and through hazardous areas that were often dark and extremely noisy containing high temperature and pressure steam or water as well as various chemicals."  (Id. at H131).  On March 21, 2005, based on the additional documentation provided, The Hartford determined that, according to the policy language, plaintiff's occupation was not a drafter, a sedentary position, but rather a lay-out engineer, which is a more strenuous but still a light occupation.  (Id. at H102-04, 139-44).

To assist in the determination of plaintiff's administrative appeal, The Hartford hired the University Disability Consortium ("UDC"), a group of independent physicians who perform disability evaluations.  The two UDC physicians that performed the medical   records review were Dr. David Greco (neurologist) and Dr. Milton Jay (neuropsychologist).  To facilitate the review, The Hartford provided Drs. Greco and Jay with plaintiff's medical and psychological records, the August 8-9, 2004 surveillance video (Doc. 19), plaintiff's appeal letter, the letter from Harris Group discussing plaintiff's job requirements that plaintiff submitted in support of his appeal and the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") description of the duties of a lay-out engineer.  (Id. at H90-100, 126-27).

Dr. Greco concluded that there was "no evidence that [plaintiff] has any physical deficits including that of any significant visual deficits that would preclude him from returning to his prior occupation."  (Id. at H92).  Dr. Greco noted that his decision

was based on "the video surveillance, the recommendations of Dr. Hered, and the claimant's own statements" and that "[a] more thorough evaluation of the claimant's cognitive skills will be performed by Dr. Milton Jay [neuropsychologist]."  (Id.).

Dr. Jay reviewed the September 17, 2003 neuropsychological report of Dr. Addeo and the October 22, 2003 Mental Evaluation Report of Dr. Maida to form his opinions as to plaintiff's cognitive abilities, and whether or not he would be able to function in his position with Harris Group.  (Id. at H94).  Dr. Jay noted that "the scope of procedures that Dr. Addeo utilized in his evaluation was reasonably consistent with the usual expectations of a comprehensive neuropsychological examination of disability determination quality. ... Dr. Addeo's evaluations surveyed all of the major domains of higher cognition, as well as psychiatric status."  (Id. at H94-95).  Conversely, upon evaluating the scope of the examination and the tests that Dr. Maida administered to plaintiff, Dr. Jay stated that, "[c]onsistent with [Dr. Maida's] statement of 'brief psychological assessment,' it was evident that Dr. Maida was not attempting to conduct a substantive neuropsychological assessment.  Cognitive testing was limited [and] ... did not constitute even a basic neuropsychological screening examination."  (Id. at H96).

After performing his review of the records and noting his assessment of the extent of the previous neuropsychological and cognitive evaluations, Dr. Jay made the following findings:

1.  "[T]he available data did not provide a sufficient body of reliable and valid findings to suggest post-traumatic cognitive losses.  As a consequence, I did not see adequate support that [plaintiff's] occupational capacity was significantly hindered by post-traumatic cognitive problems."  (Id. at H97).

2.  "[Plaintiff's] general cognitive performances regarding intellect, sensory-perceptual, motor, attention, executive, language, visual-perceptual, and constructional performances were broadly normal and within reasonable expectations ...."  (Id. at H98).

3.  While plaintiff performed poorly on cognitive tests related to memory, Dr. Jay agreed with Dr. Addeo that "poor memory findings could not be accepted as valid, given the abnormal performances on tests of effort."  Specifically, Dr. Addeo's findings were that plaintiff failed to put forth the requisite effort on the memory tests, which skewed his results.  Dr. Jay agreed with this assessment and pointed out that plaintiff's performance on certain neuropsychological tests were neuropsychologically illogical.  (Id. at H98).  Dr. Jay further concluded that, "[t]hese patterns of comparative memory findings collectively indicated that neurological damage was a very unlikely source, given their illogical nature."  (Id.).  Thus, Dr. Jay opined that, "[he] saw good support for Dr. Addeo's conclusion that poor memory findings could not be accepted as valid and reliable cognitive performances. ... [Dr. Addeo's] conclusion that [plaintiff] had shown no valid data to support a condition that would subvert his occupational capacity appeared well supported .. [and that] he [Dr. Jay], too, came to that impression."  (Id. at H99).

4.  "[T]he quality and scope of the examination conducted by Dr. Maida was not at all sufficient, in my estimation, to counter the far more extensive findings from one month previously from [the] comprehensive neuropsychological evaluation by Dr. Addeo.  Certainly, Dr. Maida conducted no test of cognitive symptom validity, an absolute 'must' to confirm legitimate post-traumatic cognitive problems for an examinee who a month earlier had failed 2/3 tests of effort on a vastly better examination."  (Id.).

5.  "[There is] inadequate support for the contention that the claimant

18

was significantly occupationally impaired due to post-traumatic cognitive problems." (Id. at H100).

On April 6, 2005, The Hartford informed plaintiff via letter that his administrative appeal was denied, and that the decision to discontinue long term disability benefits was correct. (Id. at H102-104). The Hartford explained that to make its decision, it reviewed all of the material in its claim file, the language of the applicable policy and the evaluations of UDC physicians, Drs. Greco and Jay. (Id.). The appeal denial letter informed plaintiff of his right to file suit under ERISA. (Id.).

On April 29, 2005, plaintiff sent a letter to The Hartford enclosing a "To Whom It May Concern" letter dated March 28, 2005 and authored by Dr. Smithwick (ophthalmologist). (Id. at H786). The Hartford received this letter after the close of the administrative appeal. The Smithwick letter states that while plaintiff's double vision improved as a result of the strabismus surgery performed by Dr. Hered, he still has double vision when he looks to the left and right, as well as up and down. (Id.). Dr. Smithwick further notes that plaintiff further complained of "memory loss with intermittent dizziness," "numbness in his cheek on the right side," and "issues with balancing when raising his leg." (Id.). Dr. Smithwick concludes that plaintiff "will no longer be able to adequately perform the job duties on a permanent basis." (Id.).

The Hartford responded that the administrative record closed on April 5, 2005, (when The Hartford made its decision on plaintiff's appeal), and that no additional information submitted thereafter (i.e., the April 29, 2005 letter enclosing the Smithwick

letter) would be considered.  (Id. at H788).   On May 27, 2005, plaintiff filed this lawsuit, which is now due to be decided on cross motions for summary judgment.

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The existence of some factual disputes between the parties will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there is no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The substantive law applicable to the causes of action at issue will identify which facts are material.  Id.

Further, "[i]n an ERISA benefit denial case ... in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  Curran v. Kemper Nat. Servs., Inc., 2005 WL 894840, *7 (11th Cir. 2005) (unpublished per curiam opinion) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)); accord Clark v. Hartford Life and Accident Ins. Co., 2006 WL 890660, *2 (M.D. Fla. April 6, 2006) (unpublished opinion).

**B.    Applicable ERISA Standards**

Under ERISA, the plaintiff "has the burden of showing that [s]he is entitled to the 'benefits under the terms of [the] plan.'" Stvartak v. Eastman Kodak Co., 945 F.Supp. 1532, 1536 (M.D. Fla. 1996) (quoting 29 U.S.C. § 1132(a)) aff'd, 144 F.3d 54 (11th Cir. 1998).   ERISA provides no standard for reviewing decisions of plan administrators or plan fiduciaries.   Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989).   After Firestone, the Eleventh Circuit adopted three separate standards for reviewing administrators' plan decisions: "(1) *de novo* where the plan does not grant the administrator discretion [i.e., the administrator does not exercise discretion in deciding claims]; (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] ... [he has] ... a conflict of interest." Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134-35 (11th Cir. 2004) (quoting HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001) (citation omitted)).

In Williams, the Eleventh Circuit recapitulated the applicable framework for analyzing "virtually all" ERISA plan benefit denials:

1.    Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2.    If the administrator's decision in fact is "*de novo* wrong," then determine

> whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> 3.   If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> 4.   If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> 5.   If there is no conflict, then end the inquiry and affirm the decision.
>
> 6.   If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Id. at 1137-38.

Based on the "virtually all" language in Williams, it appears at first blush that the six step analysis applies in every ERISA long term disability benefits denial case. See Williams, 373 F.3d at 1137-38. The Williams court even footnoted this language and stated that "[w]e thus mean both benefits denials based on plan interpretations as well [as] on factual determinations, since many, if not most determinations will involve 'issues of both plan interpretation and fact,' ... and we will otherwise wait to be confronted by principled exception to say otherwise here." Id. at 1137, n. 6. Thus, one reading of Williams is that the Eleventh Circuit meant for the six step framework to apply to *all* ERISA cases, regardless of whether the administrator is vested with discretionary authority to determine eligibility for benefits or if there is a conflict of interest. An equally plausible reading, however, is that Williams presupposes the

22

"heightened arbitrary and capricious" standard applies, and that the "*virtually all*"

refers only to cases where the conflict of interest exists.  See id. at 1135, 1137-38;

see also Anderson v. Unum Life Ins. Co. of America, 414 F.Supp.2d 1079, 1102-03

n. 19 (M.D. Ala. Feb. 13, 2006).

Nevertheless, the parties here agree that the Court must proceed under

Williams to the extent allowed.  (Doc. 15, pp. 14-16; Doc. 16, pp. 11-12).[8]  In fact, at

oral argument, Continental Casualty's counsel stated the Eleventh Circuit, through the

use of the "virtually all" language in Williams, intended for the district courts to

undertake the six step analysis in every case (regardless of whether the policy at

issue vests the administrator with discretion to make eligibility determinations) until

the circumstances dictate that the court must stop.

As a preliminary matter, this Court sees it fit to undertake the following two

salient inquiries to determine how far through the Williams progression this Court may

travel to decide this case: (1) whether the plan vests discretion in the plan

administrator to determine eligibility for benefits; and (2) whether the plan

administrator has a conflict of interest inasmuch as it determines eligibility for benefits

_____

[8]    In plaintiff's Amended Motion for Final Summary Judgment (Doc. 15), plaintiff cites Williams as the applicable *de novo* standard to apply in this case.  However, in the response to defendant's dispositive motion (Doc. 21), plaintiff cites Kirwan v. Marriot Corp., 10 F.3d 784 (11th Cir. 1994) as the applicable *de novo* standard and does not mention Williams.  While the practical reality is that there is little, if any, difference between *"de novo"* under Kirwan and *"de novo wrong"* under Williams that would affect the outcome of this case, plaintiff apparently conflates the two standards and does not distinguish between them.

and then pays those benefits out of its own assets.

As to the first question, the policy provides that "[w]hen making a benefit determination under the policy, [Continental Casualty] has discretionary authority to determine [the participant's] eligibility for benefits and to interpret the terms of the policy." (Doc. 1, Ex. "A," p. 1). To trigger the arbitrary and capricious standard, the Eleventh Circuit requires that the policy expressly grant discretionary authority to the administrator to make eligibility determinations. Kirwan, 10 F.3d at 788 (citation and quotation omitted); Crume v. Met. Life Ins. Co., 417 F.Supp.2d 1258, 1271 (M.D. Fla. Feb. 14, 2006).

There is no doubt that the policy expressly grants discretionary authority to Continental Casualty. The issue is whether that express grant of authority can be imputed to The Hartford on this record. The Court finds that it cannot. As plaintiff pointed out at oral argument, the administrative record is not entirely clear concerning the precise relationship between The Hartford and Continental Casualty and their concomitant duties under the policy and claim at issue. On the one hand, the undated notice provided to plaintiff informing him of the sale of CNA's long term disability business to The Hartford and the long term disability employee statement that contains the handwritten note ("CNA - original policyholder with Harris at time of accident - sold to Hartford - 2004"), purports to show that The Hartford obtained the rights and liabilities under the policy (including the discretionary authority under the

24

policy to make eligibility determinations).  (A.R. H417-19).  On the other, the April 6, 2005 appeal denial letter contains language in the header that the policy and claim at issue are "[u]derwritten by Continental Casualty Company [and] Administered by The Hartford."  (Id. at H102).  As plaintiff posits, that language can be interpreted that The Hartford merely assumed responsibility as a third party administrator of the claim, rather than obtained all of Continental Casualty's assets and liabilities, which would include the discretion to make eligibility determinations.

While the parties did not cite and the court could not find a case directly on point, the record and pleadings before the Court in this case are inadequate for defendant to prove that The Hartford indeed assumed the responsibilities of Continental Casualty pursuant to any sale of assets, and was thus expressly vested with discretion to administer and pay the claim under the policy.   First, the administrative record itself is ambiguous as to the precise relationship between Continental Casualty and The Hartford.  Defendant's reliance on (1) the undated notice sent to plaintiff informing him that The Hartford was responsible for communicating with plaintiff and paying his claim and (2) the unidentified handwritten note at the top of plaintiff's claim are insufficient to establish that The Hartford "stepped into the shoes" of Continental Casualty and assumed Continental Casualty's discretion under the policy.  Second, defendant has submitted no other evidence, via affidavit or otherwise, that The Hartford bought the assets and liabilities of CNA's long

25

term disability business (Continental Casualty), and that, by implication, any such acquisition included the function of administering and paying plaintiff's claim. Third, plaintiff sued Continental Casualty, who remains as the defendant in this case. Continental Casualty neither moved to dismiss because it was an improper party nor did it seek to substitute The Hartford as the proper defendant pursuant to Rule 25(c), Federal Rules of Civil Procedure.

While the Court notes that The Hartford could very well be a successor in interest to Continental Casualty under contract law, Continental Casualty failed to make the proper evidentiary showing to demonstrate this sufficient to trigger the arbitrary and capricious standard in this case. See Williams, 373 F.3d at 1135 (citations omitted). Further, because the Court finds that the record is insufficient to impute Continental Casualty's discretion under the policy to the Hartford, the Court does not reach the conflict of interest inquiry, which, if found, triggers the application of the heightened arbitrary and capricious standard. See Brown, 898 F.2d at 1563 (there is an inherent conflict of interest posed by benefits determinations made by an insurance company administering its own policy); Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1325-26 (11th Cir. 2001) (where administrator of ERISA plan pays out benefits to participants out of its own assets, "a conflict of interest exists between its fiduciary role and its profit making role. Thus, the proper standard in [such a] case is a heightened arbitrary and capricious standard."); Yochum v. Barnett

Banks, Inc. Severance Pay Plan, 234 F.3d 541, 544 (11th Cir. 2000) (citing Brown,

898 F.2d at 1566).  This Court will apply the *de novo* prong of Williams to determine

whether the administrator properly discontinued benefits to plaintiff.

**B.    *De Novo* Review**

**1.    The cognitive disabilities**

Plaintiff's alleged cognitive disabilities are that he suffers from short term

memory loss and an inability to process the complex data necessary to perform his

job functions.  Under the first prong of Williams, the Court finds that the administrator

was correct in its decision that plaintiff was no longer entitled to long term disability

benefits based on his alleged cognitive dysfunctions.  While the Court notes that Drs.

Addeo and Maida came to vastly different conclusions concerning the scope of

plaintiff's cognitive functions relating to his memory[9], it finds Dr. Jay's independent

_____

[9]    The Court notes that on December 6, 2003 the Social Security Administration determined that plaintiff was disabled, based, in part, on Dr. Maida's findings.  (A.R. H544).  While the undersigned may consider that determination in reviewing the plan administrator's decision regarding eligibility for benefits under ERISA, see Kirwan, 10 F.3d at 790 n. 32, such a determination is not dispositive.  See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832 (2003) (there are "critical differences between the Social Security disability program and ERISA benefit plans ..."); see also Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000) ("[B]enefit eligibility determinations by the Social Security Administration are not binding on [ERISA] disability insurers"); Crume, 417 F.Supp.2d at 1276 (citation omitted).  Further, Nord explicitly declines to adopt any "treating physician" rule, stating, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  538 U.S. at 834.

analysis of plaintiff's medical records (psychological and neuropsychological) assessing the scope of the two inquiries persuasive.  Dr. Jay's findings comport with those of Dr. Addeo.

Based on the rather comprehensive battery of tests that Dr. Addeo administered to plaintiff in September 2003, Drs. Addeo and Jay agree that plaintiff is cognitively capable of performing his duties as a senior design engineer (or a layout engineer).  In fact, Drs. Addeo and Jay both concluded that plaintiff failed to provide the adequate effort necessary to result in accurate scores on certain tests addressing plaintiff's memory.  Dr. Jay illustrates this finding by showing the illogical nature of plaintiff's performance on certain neurological tests.  For example, plaintiff performed better on incidental visual recall tests, where he was asked to draw images that he had previously seen, than on consciously directed visual memory tests, where he was asked to recall images he had previously seen.  (A.R. H98).

Dr. Jay criticized the scope of Dr. Maida's exam as not detailed enough to determine plaintiff's true capabilities of performing his job functions.  Dr. Jay also criticized Dr. Maida for failing to perform any test designed to address "cognitive symptom validity," which Dr. Jay deemed "a must" to "confirm legitimate post-traumatic cognitive problems for an examinee who a month earlier had failed 2/3 tests of effort on a vastly better examination." (Id. at H99).  Plaintiff assails the findings of Drs. Addeo and Jay based upon their alleged failure to consider plaintiff's true job

requirements, which encompassed the previously discussed field work in addition to the detailed in office designing functions.  However, the record reveals that Dr. Jay had the DOT description of a layout engineer (the description of which comports with Harris Group's description of plaintiff's position sent to the administrator on January 31, 2005 (Id. at H360-61), and the January 31, 2005 letter from Harris Group to the administrator clarifying the specific nature of plaintiff's position (i.e., that it was not entirely sedentary duty, but also required light duty field work).  (Id. at H139-44, H360-61).  Because the administrator provided Dr. Jay with the accurate descriptions of the nature of plaintiff's regular occupation and he "review[ed] the entirety of the provided medical records," the Court cannot conclude that the administrator was incorrect, or "wrong," to ascribe weight to Dr. Jay's findings and determine plaintiff was no longer entitled to benefits due to any cognitive dysfunction.[10]

## 2.   The visual and physical disabilities

Plaintiff's alleged physical disabilities are (1) problems with his vision (primarily double vision), (2) dizziness and (3) difficulty in balancing.  On April 30, 2004, two

---

[10]   Even though Dr. Jay performed a records review of plaintiff, and did not treat the plaintiff, it was not improper for the administrator to ascribe weight to his findings. See Richards v. Hartford Life and Accident Ins. Co., 356 F.Supp.2d 1278, 1286 (S.D. Fla. 2004) (holding it was not "wrong" of administrator to rely on the findings of an independent physician, who reviewed the claimant's medical records, rather than treated the claimant), aff'd 153 Fed.Appx. 694 (11th Cir. 2005); see also Gannon v. Met. Life Ins. Co., 360 F.3d 211, 214 (1st Cir. 2004) ("physician's review of a claimant's file" is "reliable medical evidence" to support denial of benefits); Hightshue v. AIG Life Ins. Co., 135 F.3d 1144, 1148 (7th Cir. 1998) (administrator was entitled to rely on physician's review of claimant's medical file).

months after the surgery to correct plaintiff's double vision, Dr. Hered (ophthalmologist) noted that plaintiff had "excellent postoperative alignment," that plaintiff "[felt] his condition  ... improved significantly since surgery," "[plaintiff] feels safe with driving" and "[plaintiff] is able to read, although he needs to hold books away from down-gaze in order to avoid [double vision]." (A.R. H247). Then, on December 8, 2004, Dr. Hered responded to the November 30, 2004 inquiry (a letter) from The Hartford that plaintiff could return to his position with Harris Group as a lead design engineer with no restrictions. (Id. at H229-30).

Plaintiff posits that, in its December 8, 2004 letter to Dr. Hered, The Hartford failed to provide Dr. Hered with an accurate description of his position (i.e., that The Hartford provided a written description to Dr. Hered stating that plaintiff's position was entirely sedentary, when, in fact, plaintiff's position is more aptly described as a light duty position including "field activities" as set forth on pages 14 through 16 above). A *de novo* review of the record illustrates that after Dr. Hered placed no ocular restrictions on plaintiff, (Id.), The Hartford and Harris Group clarified that in addition to "in office" sedentary work, plaintiff's job also entailed the "field activities." (Id. at H360-61). While Dr. Greco (neurologist) opined there was "no evidence that [plaintiff] has any physical deficits including that of any significant visual deficits that would preclude him from returning to his prior occupation," the revised job description and any effect it had on plaintiff's ability to perform his duties with Harris Group was never

reviewed from an ophthalmological perspective by Dr. Hered, or any other ophthalmologist. Given plaintiff's consistent documented complaints of double and blurry vision and that the field duties of plaintiff's position were not adequately addressed by the visual professionals, there is insufficient evidence to support the administrator's findings in this regard. Thus, the disability determination is due to be remanded to the administrator for complete ophthalmological findings.

Accordingly, it is hereby **ORDERED**:

1.     Defendant, Continental Casualty Company's, Motion for Summary Judgment (Doc. 16) is **GRANTED IN PART AND DENIED IN PART**, and Plaintiff, Roger D. Sullivan's, Amended Motion for Summary Judgment (Doc. 15) is **GRANTED IN PART AND DENIED IN PART**.

2.     The case is **REMANDED** to defendant for the administrator to make an appropriate finding relating to the alleged visual impairments and plaintiff's claim of entitlement to past, current and future benefits relating thereto. See Jett v. Blue Cross and Blue Shield of Alabama, Inc., 890 F.2d 1137, 1140 (11th Cir. 1989). On remand, the administrator should conduct a good faith, *de novo* review of plaintiff's visual impairments, considering all of the pertinent information in the administrative record, including plaintiff's proper job description (i.e., the job description issued by Harris Group in January 2005 - Doc. 17 at H360-61, H131-32), Dr. Smithwick's March 28, 2005 letter and any other additional information added by either party to the record

prior to **September 15, 2006**.[11]   If the administrator orders additional testing or

schedules medical visits, plaintiff must promptly comply.   The administrator should

then determine from an ophthalmological and vocational perspective whether plaintiff

is disabled within the meaning of the disability plan.[12]

No later than **October 18, 2006**, defendant shall serve plaintiff's counsel and

file with the Court a written decision concerning the plaintiff's benefits claim.   While

the administrator's decision need not be as formal as a judicial opinion, it should state

in detail what information it considered and give reasons for its decision, supported

by the record.

No later than **November 8, 2006**, plaintiff shall serve defendant and file with the

Court a memorandum stating its position with regard to defendant's new benefits

decision, any issues which remain for determination by the Court and a proposal as

––––––––––––––––––––

[11]   Although the Court recognizes that it may not have been improper for the administrator to close the administrative record when it issued its April 2005 appeal denial and to originally decline to consider the March 2005 Smithwick letter (which was sent to the administrator after it rendered its appellate findings), given this remand, the administrator should not only consider the Smithwick letter, but also any additional ophthalmological findings added to the administrative record by either party by September 15, 2006.

[12]   While the Court remands this case to the administrator for a de novo consideration from an ophthalmological perspective, the administrator should not merely limit its consideration to plaintiff's ocular function, but should also assess any such findings from a perspective of whether, in concert with plaintiff's other maladies, plaintiff is "disabled" under the plan.   That the Court has remanded the case for additional consideration should not be viewed as the Court expressing any opinion as to the outcome on remand.

to how the Court should resolve those issues.  No later than **December 6, 2006**, defendant shall serve plaintiff and file with the Court a responsive brief addressing these same issues.

Absent extraordinary circumstances, the Court envisions no extensions of these deadlines being given.  The Court will then take the matter under advisement and either issue any necessary decision or schedule the matter for a further hearing.  In the meantime, this action is **STAYED** pending further Order of this Court.

**DONE AND ORDERED** at Jacksonville, Florida this <u>21st</u> day of July, 2006.

TIMOTHY J. CORRIGAN
United States District Judge

t
Copies: counsel of record